**CATERPILLAR OVERSEAS, S.A.,**
Plaintiff–Appellee,

v.

**MARINE TRANSPORT INC.,**
Defendant–Appellant,

Farrell Lines, Inc.; Virginia International Terminals, Inc.,
Defendants–Appellees.

**CATERPILLAR OVERSEAS, S.A.,**
Plaintiff–Appellant,

v.

**FARRELL LINES, INC.;** Virginia International Terminals, Inc.; Marine Transport Inc., Defendants–Appellees.

**CATERPILLAR OVERSEAS,**
S.A., Plaintiff,

v.

**FARRELL LINES, INC.,**
Defendant–Appellant,

**Marine Transport Inc.,**
Defendant–Appellee,

and

**Virginia International Terminals, Inc., Defendant.**

Nos. 88–3114, 88–3119 and 88–3122.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 8, 1989.
Decided April 5, 1990.

as the other port to which the cargo was being transported, the carrier Farrell, and the trucker who transported the cargo from the Portsmouth Port to the Norfolk International Port. The district judge found the port terminal free of negligence but concluded both the carrier and the trucker had caused the damage to the cargo by their negligence. He found, though, that the carrier's liability was limited by the application of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. § 1304(5) to $500.00 but that the trucker was not entitled to the limitation of liability provided it under the "Himalaya" provision in the bill of lading. He also restricted the shipper to its actual loss, eliminating any profit, in his award. The shipper appeals both the district judge's limitation of the carrier's liability to $500.00 under COGSA and the elimination of the recovery of the profit it expected from delivery of the cargo at destination; the trucker appeals the failure to provide it the limitation of liability under COGSA. We affirm.

William Brinkley Eley, Willcox & Savage, P.C., Norfolk, Va., for defendant-appellant.

Carter Branham Furr, Jett, Berkley, Furr & Bouffard, Philip Norton Davey, Hunton & Williams, Charles Faulkner Tucker, Sr., Vandeventer, Black, Meredith & Martin, Norfolk, Va., for plaintiff-appellee.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The shipper in this case has sued to recover damages to cargo delivered by it to a sea carrier for transportation to a foreign port. The cargo was damaged while being transferred overland by a trucker employed by the carrier from the port of delivery to another port in the same vicinity. The defendants were the port terminal, which owned and operated the ports to which the cargo was first delivered as well

I.

The plaintiff Caterpillar Overseas (Caterpillar), a Swiss corporation, is a subsidiary of Caterpillar, Inc., an American manufacturer, and is engaged in the business of sales representative for the products of its parent company in Europe, Africa and the Middle East. Caterpillar had sold a D–6 Caterpillar tractor to Chanimat, a Zaire corporation, for delivery via sea carriage at piers in Matadi, Zaire. The invoiced purchase price to Caterpillar from its parent for the tractor was $79,447.86. The tractor, manufactured by the parent at its plant in East Peoria, Illinois, was transported by truck to the Portsmouth (Virginia) Port for delivery to Caterpillar. Caterpillar, in turn, had arranged with Lusk Shipping Company to act as its agent and freight forwarder to handle the shipment of the tractor to Zaire. Under the original understanding between the parties, Lusk agreed with Farrell to ship the tractor to the Zaire destination on Farrell's vessel EXPORT CHAMPION, scheduled to arrive momentarily at the Portsmouth Port.

However, when EXPORT CHAMPION arrived at Portsmouth, it was withdrawn from service and put in dry dock. Lusk was advised of the unavailability of EXPORT CHAMPION and it and Farrell agreed that the tractor should be transferred to the Norfolk International Port (Norfolk), which was owned and operated by the same terminal as the Portsmouth Port, where Farrell's vessel EXPORT FREEDOM was presently to dock and would be available to transport the tractor to Zaire. It was the intention and agreement of the parties that the tractor in this case was to be transported by the vessel EXPORT FREEDOM. Such a transfer between the two related ports was not unusual; in fact, it was said to be a practice well known and followed from time to time by both Lusk and Farrell.

Under the agreement between the parties, the arrangements for the transfer and any costs connected with the transfer between the two ports was the responsibility of Farrell, which employed Marine Transport (Marine), an independent trucker, to make the transfer using a flatrack container and chassis furnished for such purposes by Farrell. Virginia International Terminals (VIT), in turn, prepared the tractor for the necessary transportation from the Portsmouth Port to the Norfolk Port. As described by VIT's foreman, the tractor was put on a "flat rack which [was] on the chassis" in a "ro-ro fashion" and it was supposed to "stay on that flat rack until it [got] to overseas which it's gonna go." The floor of the flat rack was 69 inches above ground; the tractor itself was 9 feet 8 inches high. The load was thus overheight under state law. Had Farrell furnished a lowboy for loading the cargo for transportation between the ports, the height of the cargo and carriage would have been substantially less, a factor which, according to the testimony, would have made the transportation safer.

When Marine Transport's driver took charge of the flat rack and its cargo at the Portsmouth Terminal, he questioned the safety of the cargo, as loaded, with Farrell, which assured him the arrangement was safe. The driver, still uncertain, consulted his employer Marine Transport headquarters, which instructed him to transport the cargo as loaded by Farrell. The driver accordingly proceeded with the cargo from the Portsmouth Port toward a destination at the Norfolk International Terminal. While rounding a curve in exiting Interstate 264 to enter Interstate 64 at a rate of speed estimated by the driver variously at 25 to 35 miles per hours on this trip, the tractor "slid off the flat rack and smashed into the guard rail of the highway at the uprights of the overpass," severely damaging the tractor. After the damage was surveyed by representatives of Farrell and Caterpillar, the tractor, with its component parts, was sold at salvage to the highest bidder for $12,000.00.

Caterpillar has filed suit for the difference between what it contended was the sales price of the tractor at point of delivery less the proceeds upon the salvage sale or $95,559.97. Caterpillar named as defendants in its suit Virginia International Terminals, Inc., the operator of the terminal; Farrell Lines, Inc. (Farrell), the carrier; and Marine Transport, Inc. (Marine), the trucker employed by Farrell to transport overland via interstate highways the cargo from the Portsmouth Terminal to the Norfolk International Port. Caterpillar charged that its damage was proximately caused by the combined negligence of the several defendants. VIT responded by denying all liability but alternatively alleged that, if it should be found liable, it was entitled to recovery over against Farrell, since it was acting under the specific directions of Farrell. Neither Farrell nor Marine contested their negligence as a cause of the damages to the tractor. Farrell, however, contended that its liability was limited to $500.00 under the provisions of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. § 1304(5); it also sought indemnity by Marine. Marine urged in its answer that under the so-called "Himalaya" clause in the bill of lading, its liability was similarly restricted to $500.00 by COGSA. Marine Transport also denied any liability by way of indemnity to Farrell.

## II.

The case was heard by the district judge, who, at the conclusion of the testimony, found that VIT was "not guilty of negligence which contributed to the accident and damages suffered by plaintiff" but that, had it been guilty, it "in all probability would be entitled to indemnity from Farrell." He next concluded that Farrell had been guilty of negligence that contributed to Caterpillar's damage, but that it was protected by COGSA to a liability in the amount of $500.00. In reaching this conclusion, he recognized that no bill of lading had been issued "at the time of the accident, and in fact was never issued." He found, however, that the plaintiff, through its freight forwarder, "had previously shipped goods by Farrell" on many occasions, and that the parties intended the contract of carriage to be that provided in Farrell's standard bill of lading, copies of which were in Lusk's custody. As a matter of fact, Lusk had prepared a bill of lading on the Farrell form covering this transaction, intending to deliver it at the time the tractor was on board ship. In short, the district judge found that it was the intention of both parties that the contract of carriage herein would be that stated in Farrell's form bill of lading. Under these circumstances, the district judge found that the knowledge by Lusk of Farrell's bill of lading and the intention of both parties that the transportation was to be controlled by the bill of lading was such that knowledge of acceptance of the terms of such bill of lading could fairly be imputed as the contract of carriage. He found support for this view in *Cincinnati Milacron, Ltd. v. M/V American Legend,* 784 F.2d 1161, 1166 (4th Cir.1986). He accordingly concluded that it did "not seem unduly burdensome to impute the shipper's knowledge of all of the terms in the ... bill of lading including ... the applicable provisions of COGSA," citing *Cincinnati Milacron, Ltd. v. M/V American Legend, supra,* 784 F.2d at 1166, adopted by the *en banc* court in 804 F.2d 837 as the opinion of the court on this point.

The district judge found, however, that Marine Transport was not protected by the "Himalaya" clause in the presumed bill of lading and was liable for the full loss, less the $500.00 contributed by Farrell. He said:

Marine was hired and paid by Farrell to transport the flatrack for NIT. Farrell did not select the route of travel, and did not control Marine's driver. Negligence of Marine was a proximate cause of the accident and damages. Neither the shipper nor its freight forwarder had notice that Farrell would contract with Marine to haul the goods to NIT, or how it would be loaded.

He indicated, though, that the presumed bill of lading was never intended by the parties to apply to activities connected with the transportation by an independent trucker over public highways from one port to another port.

In disposing of Caterpillar's appeal on the amount of damages for the loss of its tractor, the district judge took note of the fact that Caterpillar admitted it "could repurchase the Caterpillar [tractor] for $79,-447.86 rather than the $105,113.61," which included both the cost of the tractor and the profit Caterpillar expected to recover on the delivered cargo. The district judge concluded that the plaintiff was entitled to the "loss sustained [*i.e.,* $79,447.86, less the salvage value of $12,000.00] but not for 'a retail profit which it [he] had not earned.'" To summarize, the district court granted judgment to the plaintiff against Marine for $79,447.86 plus expenses as agreed by the parties, less the $12,000.00 realized from the salvage of the damaged tractor and against Farrell for $500.00 to be deducted from the award against Marine Midland. It denied *sub silentio* any right of Farrell to recovery from Marine.

## III.

All parties have appealed the judgment of the district court. Caterpillar contests the application of the rule of limitation of liability found in favor of Farrell on the basis of an assumed bill of lading including the limitation of liability authorized by COGSA and the order restricting its recov-

ery by eliminating from its award the profit to be received for the sale and delivery of the tractor to the purchaser in Zaire. Farrell appeals from the denial of its right of recovery over against Marine. Marine's objection is directed to the district court's ruling that it was not entitled to the benefit of the "Himalaya" clause in the bill of lading and to the holding that VIT was free of negligence in connection with the damage sustained by Caterpillar. We address these objections to the judgment *seriatim*, beginning with those of Caterpillar.

## IV.

■ Caterpillar raises a number of objections to the district judge's finding that Section 1304(5), 46 U.S.C.App., is applicable in this case. Its first claim of error is based upon the absence of an executed bill of lading. It is agreed that COGSA's limitation of the carrier's liability to $500.00 does not exist if "the nature and value of [the cargo] have been declared by the shipper before shipment and inserted in the bill of lading." [1] It follows that the Act requires a bill of lading offering the shipper " 'a fair opportunity to choose between higher or lower liability by paying a corresponding greater or lesser charge.' " *Cincinnati Milacron, Ltd. v. M/V American Legend, supra,* 784 F.2d at 1163, reversed by an *en banc* court in 804 F.2d 837 (4th Cir.1987) on other points. Further, Section 1307 covers *only* the period "prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea," unless the parties have agreed to extend the coverage of Section 1304(5) to the period after the cargo has come into the custody of the carrier and before the cargo has been loaded on ship. 46 U.S.C.App. § 1307. Normally, agreement to such extension is found in the bill of lading.[2] Again, to follow Caterpillar's argument, the essentiality of a bill of lading is clear if Section 1304(5) is to be applied in this situation. Since no bill of lading was executed by both parties, it is Caterpillar's position that the requirements of a "fair opportunity" to choose by the shipper and of an agreement to extend the coverage of Section 1304(5) to a period before actual loading on ship of the tractor, were not given, and COGSA is therefore inapplicable.

■ The district judge found, however, that on the basis of the dealing of the parties, it was proper to impute a bill of lading as the contract of carriage fixing the rights and liabilities of the parties. Both of the parties to this transaction—Caterpillar and Lusk, on the one hand, and Farrell on the other—were experienced and sophisticated in the shipping business. Not only were they experienced, they had a long record of doing business with each other. In all contracts of carriage involving Caterpillar cargo, Lusk, as Caterpillar's agent, used uniformly the form of bill of lading prepared by Farrell. Lusk had copies of such forms of bill of lading for this purpose. The customary practice of Lusk and Farrell was that when Lusk had cargo for carriage by Farrell it would prepare and sign a bill of lading covering the transportation of the cargo using the Farrell form, but it did not actually deliver the bill of lading for acceptance and execution by Farrell until the cargo was actually delivered on board ship. The freight forwarder did precisely that in this case. It prepared a long-form bill of lading covering the cargo in this case. It, however, held it in accordance with the custom until actual delivery of the cargo on board ship. Since the cargo was never delivered to the ship, the bill of lading was never delivered. It is

---

1. Limitations of liability such as that given by Section 1304 are to be distinguished from exemptions from liability. The reasons for such distinction are stated in *Tessler Bros. (B.C.) Ltd. v. Italpacific Line,* 494 F.2d 438, 443 (9th Cir. 1974);

    A limitation [of liability], unlike an exemption, does not induce negligence. Compensation for carriage is based on the value of the cargo agreed on by the carrier and the cargo owner and, unless immunized by act of Congress [*see* 46 U.S.C.App. § 1304(2) ], a carrier who negligently damages cargo must respond in that value for its negligence.

2. There is such a provision in the Farrell form bill of lading, and there is no claim that such extension was agreed to apart from the bill of lading.

obvious that, while the bill of lading was not delivered, the parties understood that the cargo was covered by the terms of the bill of lading from the time of receipt of the tractor at terminal by Farrell. Nor is it of any materiality that the tractor was destroyed before it could be placed aboard ship; the contract of carriage attached from the time of delivery to Farrell at the Portsmouth Port. The district judge based his finding for imputing the terms and conditions of Farrell's standard bill of lading as the contract of earnings between the parties on this state of the facts. He concluded that this result was sustained by Judge Phillips' dissenting opinion in *Cincinnati Milacron*, 784 F.2d at 1166, which opinion was adopted as the opinion of the *en banc* court on rehearing, 804 F.2d 837. We agree.

The form bill of lading in *Cincinnati Milacron* was the short form. That short form did not in express terms give "fair opportunity" to the shipper to choose to state value of cargo or not or incorporate many other provisions in the larger form of lading; it did by reference seek to incorporate in its terms those of the long form. Judge Phillips, in his opinion, held at the outset the terms of the long-form to be effective by reference in the short form. He then referred to the fact that the terms of the long-form bill of lading were "posted in [the carrier's] office ... and on board the AMERICAN LEGEND, was filed with the Federal Maritime Commission, and was available upon request as provided in the shortform given to shippers." He concluded that it did "not seem unduly burdensome to impute to shippers knowledge of all of the terms in the more accessible longform bill of lading, including, where they appear, the applicable provisions of COGSA." We think this reasoning equally applicable in this case. In *Cincinnati Milacron*, the court imputed knowledge of the terms of the long-form bill of lading by the shipper even though the long-form bill of lading was not used. In this case, the terms of the longform, though not delivered or formally executed, were known, and both parties understood and intended those terms to apply. We see no real difference in principle between this case and that of *Cincinnati Milacron*. We therefore affirm the ruling of the district judge imputing to the shipper and carrier the terms of Farrell's regular long-form bill of lading.

### V.

■ Caterpillar raised next the point that, even though the terms of Farrell's long-form bill of lading might be imputed as the contract of carriage here, the transfer of the cargo by truck over a public highway from the Portsmouth Terminal to the Norfolk International Port represented an "unreasonable deviation" in the agreed carriage increasing the risk of damage and that such deviation deprived Farrell of the right to limitation of liability afforded by Section 1304(5). The opinion of the district judge does not discuss the point. We assume he took the view, as have some courts, that the deviation doctrine has not survived the enactment of Section 1304(5). The reasoning of the courts which have taken this view is that such statute provides unequivocally that the limitation of liability authorized thereunder is valid *"in any event"* unless the shipper has declared the value of the cargo. The leading authority for this view is *Atlantic Mut. Ins. Co. v. Poseidon Schiffahrt*, 313 F.2d 872, 874 (7th Cir.), *cert. denied*, 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 53 (1963). On the other hand, there is another line of cases, of which *C.A. Articulos Nationales de Gomaven v. M/V Aragua*, 756 F.2d 1156, 1158–59 (5th Cir.1985), is representative. That court said:

> Since deviation and the principle that an unreasonable deviation annulled the contract of carriage were established parts of the maritime law prior to COGSA, this circuit has consistently held that an unreasonable deviation, whether geographic or otherwise, still operates to deprive the carrier of any limitation of liability in the contract of carriage, including COGSA's $500 per package limitation.

The Second Circuit has recently established a somewhat middle ground in *Sedco, Inc. v. S.S. Strathewe*, 800 F.2d 27, 31, 32

(2d Cir.1986). In that case, the court declared that the doctrine of unreasonable deviation, though perhaps "a doctrine of doubtful justice under modern conditions, of questionable status under COGSA, and of a highly penal effect," continues to bar a carrier from invoking COGSA's $500.00 per package limitation only "to two situations: geographic deviation [3] and unauthorized on-deck stowage ('quasi-deviation')." This view confines the doctrine to its original scope but, recognizing that the principle of deviation is at least "arguably inconsistent with COGSA" would not extend it.

This court has not had occasion to rule either on the continued vitality or scope of the doctrine. In *The San Giuseppe,* 122 F.2d 579 (4th Cir.1941), where a claim of unreasonable deviation was asserted as a ground for unlimited recovery, we found it unnecessary to inquire into the effect of the enactment of COGSA on the doctrine, since we found that, under prior law, the action of the vessel in deviating for bunkers was not an unreasonable deviation from the contract voyage. We do, though, have a number of district court decisions on the doctrine. Thus, In *Minex v. International Trading,* 303 F.Supp. 205, 209–10 (E.D.Va. 1969), Judge Hoffman discussed the doctrine and its continued status after COGSA, in which he indicated agreement with the view later expressed by the Second Circuit in *Sedco, Inc. v. S.S. Strathewe, supra,* 800 F.2d 27. Judge Hoffman did quote with approval the language of the court in *The Chester Valley,* 110 F.2d 592 (5th Cir.1940), that "[m]ere negligence with regard to the storage or handling of the cargo never constitutes a deviation." In *Electro–Tec Corp. v. S/S Dart Atlantica,* 598 F.Supp. 929, 933 (D.Md.1984), the court merely said that COGSA did not change "the traditional rule" on the doctrine of deviation, relying on the construction of the doctrine as stated in a number of early opinions of the Second Circuit. Finally, in *Insurance of North Am. v. Dart Containerline Co.,* 629 F.Supp. 781, 788 (E.D.Va. 1985), the district court commented, "a material deviation by the carrier deprives it of this limit on liability [*i.e.,* Section 1304(5) ]," citing a decision from the Southern District of New York.

Similarly to the court in *San Giuseppe,* we do not have to mark out precisely our own determination on the present status of the deviation doctrine, though our strong preference would be to accept the application of the doctrine stated in *Sedco.* The reason it is unnecessary in this case is that the change from the Portsmouth to the Norfolk Terminal was not an unreasonable deviation by any standard. The uncontradicted evidence was that a shift from one terminal to another under circumstances such as existed here was not unusual; it occurred often. Just as in *San Giuseppe,* the change was one that any shipper, and especially a frequent shipper such as Caterpillar, could reasonably anticipate. In *Jones v. The Flying Clipper,* 116 F.Supp. 386, 389 (S.D.N.Y.1953), Judge Weinfeld stated the "fundamental reason for the rule" under which limitation of liability was annulled by an unreasonable deviation. He said:

A shipper has the right to assume that the carrier will not deviate and thereby subject the cargo to other than the known risks inherent in a normal route or underdeck storage. The shipper protects himself by insurance commensurate with such calculated risks. But when the carrier deviates and enters upon "a different venture from that contemplated", he exposes the cargo to unanticipated and additional risks against which he has not protected himself. The shipper, in effect, has been lulled into a false sense of security by the carrier's action.[4]

The fact that it was common for a change such as that present here would take it out of the reason of the doctrine as declared by

---

3. Originally the doctrine was limited to cases of geographic deviations from the contract voyage. *S.S. Willdomino v. Citro Chemical Co.,* 272 U.S. 718, 727, 47 S.Ct. 261, 262, 71 L.Ed. 491 (1927); *Italia Di Navigazione, S.p.A. v. M.V. Hermes I,* 724 F.2d 21, 22 (2d Cir.1983).

4. This statement of the basis for the doctrine has been generally accepted. *See Italia Di Navigazione, S.p.A. v. M.V. Hermes I, supra,* 724 F.2d at 22.

Judge Weinfeld and as applied by the court in *San Giuseppe*. In addition, the "deviation" in this case was only made after notice to the shipper's agent on the spot, who agreed to the change. The "deviation" is thus not an "unanticipated" one; it was an agreed deviation by the shipper and the carrier. By its agreement to the change, the shipper in this case waived any right to claim an unreasonable deviation. *Royal Exchange Assur., Ltd. v. S.S. President Adams*, 510 F.Supp. 581, 585 (W.D. Wash.1981). There was accordingly no merit in any claim of error by the district court in its refusal to disallow the application here of Section 1304(5) for any claimed unreasonable deviation on the part of the carrier.

## VI.

Section 1304(5), by its express terms, applies only to shipment of goods as a "package," or, if not shipped as a package "per customary freight unit." Caterpillar asserts, as another claim of error in the district court, that the tractor in this case was neither a "package" nor a "customary freight unit" within the intendment of that Section. It would follow that Section 1304(5) would be inapplicable here. We do not agree. The bill of lading as prepared by Caterpillar's freight forwarder but not having been signed by the carrier, stated that the tractor was shipped as an "article." The stevedore described the manner in which the tractor was prepared for shipment. He testified that the tractor was "put on that container, that flat rack, and it will stay on that flat rack until it gets to overseas where it's gonna go." He added that the tractor was "loaded for shipment, and it stays on that flat rack just like it were a container all the way." Whether it qualified under these circumstances as a "package" is perhaps an arguable point. The scope of Section 1304(5) embraces cargo qualifying as a "package" or a "customary freight unit." No definition of either "package" or "customary freight unit" is included in the statute nor does the legislative history of the Act provide any guidance on the application of the terms. As is to be expected, the decisions

seeking to arrive at a definition of the terms reveal little consistency. The best definition of "package" to be distilled from the decisions is "a class of cargo, irrespective of size, shape or weight to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods." *Aluminios Pozuelo, Ltd. v. S.S. Navigator*, 407 F.2d 152, 155 (2d Cir.1968). This definition was reaffirmed in *Binladen BSB Landscaping v. M.V. "Nedlloyd Rotterdam"*, 759 F.2d 1006 (2d Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 229, 88 L.Ed.2d 229 (1985). It might be argued that the tractor in this case met this definition, especially since the bill of lading referred to it as a "package," but Farrell has chosen to concede that the tractor was not a package and to base its right on its qualification as a "customary freight unit."

Caterpillar takes the position that the term "customary freight unit" is, absent any contrary intention, to be understood as referring to the unit of cargo "customarily used as the basis for the calculation of the freight rate to be charged." Under this formula, a cargo is divided into freight units of standard dimensions of 40 cubic-foot-ton. The statutory limitation of $500.00 would apply to each separate unit. As applied in this case, the tractor would translate into 30.24 units, which, given each unit a liability limitation of $500.00, would result in a finding that Farrell's limitation of liability here would be $15,-120.00, and not $500.00. The district judge did not accept this application of the liability limitation for the carrier in this case, but he held that Farrell's limitation of liability was $500.00, treating the cargo as a single freight unit.

"Customary freight unit," like "package," has been given inconsistent definitions. *FMC Corp. v. S.S. Marjorie Lykes*, 851 F.2d 78, 80 (2d Cir.1988). In a line of recent cases, the Second Circuit, while recognizing that "some courts have held [as Caterpillar argues] that the customary freight unit is the measurement 'customarily used' to calculate the rate to be

charged," said that it had "taken a different approach." *FMC Corp. v. S.S. Marjorie Lykes, supra.* Under this new approach, the determination of the "customary freight unit" for a particular shipment requires the district court to "examine the bill of lading, which expresses the 'contractual relationship in which the intent of the parties is the overarching standard.'" In that connection the court may also "consider the tariff required to be filed with the Federal Maritime Commission, which also sets forth the freight rate." "Absent any ambiguity there, the inquiry is ended, and both parties are bound to the freight unit therein adopted. This rule provides certainty and fairness to both sides. The intended freight unit is set forth in the bill of lading, and before shipment either party could require that a different unit be expressed." Such is a summary of the Second Circuit rule, as stated in that case. 851 F.2d at 80–81. In *Aetna Ins. Co. v. M/V Lash Italia,* 858 F.2d 190, 193 (4th Cir.1988), we substantially followed this rule.

The rule stated in *FMC* was really not novel; it had already been substantially indicated in *General Motors Corp. v. Moore–McCormack Lines, Inc.,* 451 F.2d 24, 25 (2d Cir.1971) ("The courts have shown a 'strong inclination' to place heavy reliance on the bill of lading provisions in determining the 'customary freight unit.'"). Moreover, both the Second Circuit and this Circuit had followed the principle that the term "package" as defined in the bill of lading was the proper construction of that term. The rule in that case was adopted in *Pannell v. United States Lines Co.,* 263 F.2d 497, 498 (2d Cir.1959), which involved a yacht. The question in that case was whether the yacht was to be deemed a "package" under COGSA's liability limitation of $500.00. The Court said:

> The parties have defined what "package" means in the bill of lading. We see no reason why this specific definition should not prevail over the general term "package" used in the Act.

The Court accordingly held that the yacht qualified as a "package" in that case.

We followed *Pannell* in *Commonwealth Petrochemicals, Inc. v. S.S. Puerto Rico,* 607 F.2d 322, 327 (4th Cir.1979), which involved a claim of damages in connection with the shipment of a transformer weighing 47,700 pounds. The long-form bill of lading, incorporated by reference in the short-form actually used, defined "package" thus: "'It is agreed that the meaning of the word "package" includes animals, pieces and all articles of any description except goods shipped in bulk.'" *Id.* at 327. The transformer in that case was held to be a "package" under this language of the bill of lading. The court found no unfairness in such result because "[h]ad shippers wanted to obtain greater coverage than that provided by the terms of the bill of lading, that bill permitted them to declare a greater value for their goods. They did not do so." *Id.* at 328.

*Pannell* and *Moore–McCormack* involved, it is true, the question of the proper definition of "package" in this context. We, however, see no logical reason not to apply the same principles of construction in defining "customary freight unit" in this case. The two terms are stated as alternative bases for the application of Section 1304(5). It would seem that the same principle of construction should cover the determination of the application of the two terms. Accepting that rationale, we have no difficulty in concluding that the tractor in this case qualified as a "customary freight unit" under Section 1304(5). In so concluding, we rely on the express language of the bill of lading.

The long-form bill of lading provides this definition:

> The words "shipping unit" shall mean each physical unit or piece of cargo not shipped in a package, including the articles or things of any description whatsoever, except goods shipped in bulk, and *irrespective of the weight or measurement unit employed in calculating freight charges.*

(Emphasis added.)[5] That language is clear and unambiguous. No contrary evidence

---

**5.** "Shipping unit" and "freight unit" are synonymous in meaning in that both in this case refer

was offered on the meaning of "customary freight unit." Under it, the tractor was the freight or shipping unit in this case. To hold otherwise and to use either "weight or measurement" to determine freight or shipping of the tractor, identified on the bill of lading as a separate "package" would be in absolute contradiction of the provision of the bill of lading as quoted, and would violate the principle that the intent of the parties as evidenced by the bill of lading is the "overarching standard for applying the liability limitation of COG-SA." That we are unwilling to do. Caterpillar and Lusk, its agent, were familiar with the terms of the bill of lading. They were sophisticated shippers. They knew how to protect themselves in any potential damage to their cargo. *Aetna Ins. Co. v. M/V Lash Italia, supra*, 858 F.2d at 194. Caterpillar's freight supervisor testified that because of the cost resulting from a statement of value for the article shipped, Caterpillar had uniformly decided not to include a value in the bill of lading.[6] To deny Caterpillar recovery beyond $500.00 in this case is not unfair. We therefore sustain the $500.00 limitation on the carrier's liability in this case.

## VII.

■ Caterpillar's final objection to the district court's decision is directed at the award of damages. The plaintiff Caterpillar had been charged $79,447.86 for the tractor involved in this action. The tractor was to be delivered to a purchaser in Zaire, who, on delivery would pay plaintiff $105,-113.61. After adding expenses of transporting the damaged tractor to where the damages could be surveyed ($2,271.36) and selling expenses ($175.00), Caterpillar claims damages of $107,559.97, from which was to be deducted the $12,000.00 realized from the salvage sale of the tractor, leaving as Caterpillar's alleged damages $95,-559.97, Caterpillar claims should have been

the amount of the court's judgment in its favor.

The district court found that Caterpillar could and did acquire from its parent after the loss involved here a replacement D-6 tractor which was duly shipped to plaintiff's customer, which paid the plaintiff the agreed price under the original contract. The plaintiff suffered no loss of profits under these circumstances and the district court limited recovery by the plaintiff to $79,447.86. It found support for its decision in *Illinois R. Co. v. Crail*, 281 U.S. 57, 63, 50 S.Ct. 180, 181, 74 L.Ed. 699 (1930).

COGSA states that "[i]n no event shall the carrier be liable for more than the amount of damage actually sustained." It may be that the carrier's liability for damage to cargo is determined by the market value at destination if it arrived in good condition, *Texaco Export, Inc. v. Overseas Tankship Corp.*, 477 F.Supp. 289, (S.D.N.Y.1979); *affirmed sub nom. Texas Export, Inc. v. Getty Tankers, Ltd.*, and *United States Corp. v. Getty Oil Co.*, 614 F.2d 1291 (2d Cir.1979). As the Supreme Court said in *Illinois Central R. Co. v. Crail, supra*, 281 U.S. at 64–65, 50 S.Ct. at 181, this test of market value "is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to if, for special reasons, it is inexact or otherwise not applicable." This is particularly so in admiralty where the statute restricted the shipper's recovery to "damages actually received." This principle is illustrated by *Internatio, Inc. v. M.S. Taimyr*, 602 F.2d 49, 50 (2d Cir.1979), where the court said: "The market value measure is not applicable here because it would result in a recovery greater than the loss suffered." To the same effect, *Dixie Plywood Co. v. S.S. Federal Lakes*, 404 F.Supp. 461 (S.D.Ga.),

---

specifically to the "tractor", just as the Court said that similar terms were the same for purposes of decision in *Petition of Isbrandtsen Co.*, 201 F.2d 281, 286 (2d Cir.1953).

**6.** The plaintiff's international traffic supervisor testified that the insurance rate is .12 percent

under the open ocean cargo policy but an additional ad valorem charge of 3 percent of the declared value of the cargo in the export declaration. For this reason, Caterpillar chose not to declare value in the declaration and to protect itself from actual loss.

*affirmed,* 525 F.2d 691 (5th Cir.1975), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976). Even more in point here is *Illinois Central, supra,* 281 U.S. at 64, 50 S.Ct. at 181, in which the Supreme Court said:

> But in the actual circumstances the cost of replacing the exact shortage at retail price was not the measure of loss, since it was capable of replacement and was, in fact, replaced in the course of respondent's business from purchases made in carload lots at wholesale market price without added expense.

All that the plaintiff lost was the tractor, which it replaced at an even lower price. Moreover, it made delivery to the Zaire customer under its order and received the sale price at place of delivery. It realized thereby its expected profit on the sale of the tractor. Its only loss was the cost of the tractor, which was replaced, and that was all the damage the plaintiff was entitled to receive.

### VIII.

We now turn to Marine's challenge to the decision granting judgment against it for the plaintiff's actual loss. Its primary contention is that the district court erred in not granting it the COGSA liability limitation of $500.00 under the "Himalaya" clause in the bill of lading. It bases the contention on the language in the "Himalaya" clause in the disputed bill of lading in this case which extended its protection to "independent contractors," a term which it said described its relationship in this case. Marine, in its answer here, did not plead any such limitation of liability. Rule 8(c), Fed. R.Civ.P., requires the pleading of such a defense. The district court did not in its decision refer to this failure to plead by Marine and did not rest its decision either

in whole or in part on such failure but decided the case as if the duty to have pled this defense did not exist or, if it did, that requirement of pleading had been waived by the parties.[7]

■ While COGSA does not provide any limitation of liability in favor of third parties, the parties, by the bill of lading, may extend to third parties the limitation of liability granted the carrier under Section 1304(5). *See Robert C. Herd & Co. v. Krawill Machinery Co.,* 359 U.S. 297, 305, 79 S.Ct. 766, 771, 3 L.Ed.2d 820 (1959); *Mediterranean Marine Lines v. John T. Clark & Son Inc.,* 485 F.Supp. 1330, 1333 (D.Md.1980); *Tessler Bros. (B.C.) Ltd. v. Italpacific Line,* 494 F.2d 438, 442–43 (9th Cir.1974). Such limitations of liability in the bill of lading in favor of third parties, however, are to be "strictly construed." Also, by its terms, the limitation provided under Section 1304(5) ordinarily covers only the period from transportation of the cargo to the ship and delivery. Again, by the bill of lading, the parties to the contract of carriage can extend the limitation to a period "before the shipment is loaded." 46 U.S.C.App. § 1307. The bill of lading in this case does extend the liability limitations provision to the period of carriage "before the shipment is loaded and after it is discharged from the carrying vessel and throughout the entire time the goods are in the custody of the carrier until made ready for delivery" in accordance with the authorization of 46 U.S.C.App. § 1307, and also includes, as Marine argues, a "Himalaya" clause in extending the limitation of liability given the carrier under Section 1304(5) to its agents and independent contractors.

■ The district judge assigned two reasons for denying Marine the limitations of liability sought under the "Himalaya" clause. He first found that the bill of

---

7. Waiver of the failure to plead herein may result from the admission on the record of the evidence of the affirmative defense without objection. In this case, the bill of lading, with its "Himalaya" clause, was stipulated by the parties. The "Himalaya" clause was clearly evident

in the bill of lading and was before the trial court. Such a record would support a waiver of any possible failure to plead. *See Kaye v. Smitherman,* 225 F.2d 583, 594 (10th Cir.), *cert. denied,* 350 U.S. 913, 76 S.Ct. 197, 100 L.Ed. 800 (1955).

lading restricted the limitation of liability given a third party such as Marine to accidents occurring at a time the goods were "in the custody of the carrier." He held that in this case "the goods were not in the custody of the carrier at the time of the accident. They were in the custody of Marine during the transportation from PMT to NIT." In so doing, he accepted Marine's characterization of its status as that of an independent contractor which selected the route for transporting the cargo in this case from one port to the other over a substantial stretch of a heavily-traveled federal highway and which employed and controlled exclusively the driver of the truck. Marine's entire operation was non-maritime, carried out without the port terminal premises. Its lack of connection with the maritime operations was recognized because when Marine departed from the Portsmouth Terminal, it was issued an outgoing materials pass rather than an interchange receipt. These facts were the facts that the district judge found justified his holding that the tractor, at the time of the accident, was in the custody of Marine Midland. Obviously, the contractual "Himalaya" clause of the bill of lading was, by its terms, not applicable under this reasoning.

The district court also stated an alternative ground for its conclusion that Marine was not entitled to the liability limitation provided by Section 1304(5). He found that the term independent contractor does not clearly identify one in the situation of Marine as a beneficiary of the Himalaya clause. The mere designation of one as an independent contractor, as the judge suggests, is somewhat ambiguous. He cites our case of *La Salle Machine Tool, Inc. v. Maher Terminals, Inc.*, 611 F.2d 56, 60 (4th Cir.1979), in support of this point. This case, as well as *Taisho Marine & Fire Ins. Co. v. The Vessel "Gladiolus"*, 762 F.2d 1364, 1367 (9th Cir.1985), states that in determining the meaning of the term independent contractor in the application of the "Himalaya" clause the court is to take into consideration "the nature of the servic-

es performed compared to the carrier's responsibilities under the carriage contract"; and that if the independent contractor is performing a non-maritime service, that is another factor to be given weight in ascertaining whether the third party qualifies for the "Himalaya" limitation.

It cannot be argued that the trucker Marine was pursuing a maritime service in hauling the tractor a score of miles over a federal highway. To construe the use of the term independent contractor in the "Himalaya" clause of this bill of lading that broadly we think cannot be justified, especially in the light of the settled rule that limitations of liability are to be "narrowly" construed. Marine had both the custody and responsibility for the safety of the tractor while it was transporting the tractor in a truck owned and operated by it over a section of federal-state highway chosen by it and being operated by a driver hired and controlled by it. This is a far different situation than that of the stevedore whose services are rendered in the terminal facilities while engaged in actually loading directly the cargo on the ship. Stevedoring is essentially a maritime trade. Transporting cargo down a group of public highways for a stretch of miles, on the contrary, is not a normal maritime operation. We think the district judge correctly decided that Marine was not entitled to the limitation of liability given by COGSA.

■ Finally, Marine questions the district court's grant of judgment in favor of VIT. The district judge's finding was that

VIT loaded or stuffed the Caterpillar on the flatrack furnished by Farrell, and in accordance with its specific directions. It is therefore not guilty of negligence which contributed to the accident and damages suffered by plaintiff. But even if it was guilty of negligence, it followed the specific directions of Farrell and in all probability would be entitled to indemnity from Farrell.

The real negligence in the loading of the tractor for the transportation of the tractor overland was the failure to use a lowboy. However, VIT had nothing whatsoever to do with the selection of the chassis instead of lowboy for the transportation. It was Farrell's responsibility, not VIT's, to furnish the chassis for the haul by Marine. Farrell chose the chassis and not a lowboy. VIT loaded the tractor as Farrell directed on the chassis. When the tractor later fell over as the truck, hauling the chassis and tractor exited from one public highway, on a curve at an excessive speed for the time and place, and because of the height of the carriage caused by the failure of Farrell to furnish a lowboy for the transfer, the delict was that of Farrell and Marine. We cannot, under these circumstances, conclude that the findings of the district judge were in error.

The judgment below is accordingly affirmed.[8]

AFFIRMED

8. Marine sought the expunging of some material in Farrell's brief, which was not properly in the record before us. We deferred ruling on the motion until oral argument. We do not approve of the practice of some counsel to refer in their briefs in this court to matters not in the record. In this case, however, we would hesitate to reverse the judgment below for this action of Farrell's counsel, especially since it did not prejudice Marine in the decision.

Further, Farrell appealed the district court's denial of indemnity over in its favor against Marine for the judgment of $500.00 rendered against it. It has not seriously argued this conclusion on this appeal. This is understandable since the decision of the district court was correct under the circumstances of this case.