**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

S. WALLACE EDWARDS & SONS,
INCORPORATED,
            *Plaintiff-Appellee,*

v.                                              No. 02-1885

THE CINCINNATI INSURANCE COMPANY,
an Ohio Corporation,
            *Defendant-Appellant.*

S. WALLACE EDWARDS & SONS,
INCORPORATED,
            *Plaintiff-Appellee,*

v.                                              No. 02-1928

THE CINCINNATI INSURANCE COMPANY,
an Ohio Corporation,
            *Defendant-Appellant.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-02-99)

Argued: May 6, 2003

Decided: December 24, 2003

Before WIDENER and MICHAEL, Circuit Judges,
and Frank W. BULLOCK, Jr., United States District Judge for the
Middle District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge Widener wrote the opinion, in which Judge Bullock concurred. Judge Michael wrote an opinion concurring in part and dissenting in part.

---

**COUNSEL**

**ARGUED:** Calvin Wooding Fowler, Jr., WILLIAMS MULLEN, P.C., Richmond, Virginia, for Appellant. Scott James Golightly, HIRSCHLER FLEISCHER, P.C., Richmond, Virginia, for Appellee. **ON BRIEF:** Theodore J. Edlich, IV, Jonathan S. Campbell, WILLIAMS MULLEN, P.C., Richmond, Virginia, for Appellant.

---

**OPINION**

WIDENER, Circuit Judge:

Defendant Cincinnati Insurance Company appeals two of the orders making up the judgment of the district court: (1) a July 19, 2002 order granting partial summary judgment in favor of plaintiff S. Wallace Edwards & Sons, Inc. on its claims for breach of contract and declaratory judgment in the amount of $155,441.41; and (2) an August 15, 2002 order granting the plaintiff's motion to amend and awarding prejudgment interest in the amount of $11,191.78. The defendant contends that the district court erred in granting summary judgment because the plaintiff failed to set forth any objective evidence that the product was damaged under the terms of the insurance policy and that the plaintiff cannot maintain the breach of contract claim because it failed to adhere to a two-year period of limitation set forth in the insurance policy. For the reasons set forth below, we affirm the judgment of the district court.

I.

S. Wallace Edwards & Sons, Inc. (Edwards) is a wholesale seller of Virginia ham, bacon, and sausage. In September of 1999, Edwards had over 70,000 pounds of ham product stored in cold storage at Richmond Cold Storage in Smithfield, Virginia. On September 30, an

employee at the storage facility cracked a refrigerant line with a forklift, causing the release of anhydrous ammonia vapor within the storage facility. Following this incident, Edwards made a claim under its commercial property policy,[1] which defendant Cincinnati Insurance Company (Cincinnati Insurance) had issued to Edwards & Sons for April 1, 1998 through April 1, 2001. The claim alleged damage to its property due to the ham products' exposure to the ammonia. In addition to filing the claim, Edwards collected samples of the exposed product and contacted Microbac Laboratories, Inc. (Microbac), to test the product and determine the extent of the ammonia damage.

Cincinnati Insurance sent an adjuster to visit the cold storage facility and inspect the ham that had been exposed. The adjuster stated that he detected the smell of ammonia in the product, and at the direction of his supervisor requested additional evidence of the damage. The additional evidence requested and sent to the insurance company consisted of: (1) a large loss notice to Cincinnati Insurance; (2) a statement from the forklift driver or other witness; (3) a copy of the sales contract to the wholesale dealer establishing the sale price; (4) certification from the FDA that the meat is contaminated and cannot be sold;[2] (5) Proof of Loss for claim check subject to Edwards & Sons' $1,000.00 deductible; and (6) proceed with subrogation against wrongdoer.

While Edwards was waiting for the results of the tests from Microbac, the storage facility agreed to repackage the ham products. Edwards agreed, and the repackaging took place on February 10, 2000. Samples of the repackaged product were also sent to Microbac

---

[1]Edwards & Sons notified its insurance agent of the ammonia incident on October 7, 1999, and the agent contacted Cincinnati Insurance shortly thereafter.

[2]The email relaying this information requested certification from the FDA, but it is not clear from the record whether this would be regulated by the FDA or the USDA. The plaintiff stated in its brief that the USDA is the agency that regulates meat products. Upon contacting the USDA for information, the plaintiff was informed that, per regulations, the meat packer had the responsibility for assuring that the product was safe for human consumption and the USDA remained neutral until the product had been released into commerce.

for testing. Following the repackaging, on March 9, 2000, Cincinnati Insurance sent a letter to Edwards & Sons informing them that "there was nothing wrong with the ham as repackaged," and that the case was being "removed from active status."

Meanwhile, Microbac informed Edwards & Sons by letter on March 13, 2000 that it was unable to find any regulatory guidelines for the limit of ammonia in pork, other than adulteration. Thus, Microbac stated that it had arrived at its conclusion by using a reference in an FDA International Association of Refrigerated Warehouses Manual that set forth the guidelines for ammonia contamination of food products. These guidelines indicated that the ammoniacal nitrogen level in meat products normally does not exceed .15 percent and none of the plaintiff's samples had tested above .10 percent. In addition, Microbac noted that there was an ammonia odor while at the refrigerant site, but the analyst did not notice any odor while at the laboratory. There was also mention in the March 13, 2000 letter of some brown areas observed on the meat, which was assessed as probable effects from being frozen. In a later letter sent March 16, 2000, however, Microbac retracted its earlier statement and concluded that it was unable to determine the cause of the brown areas.

Due to Edwards' uncertainty about the safety of the product and Microbac's indeterminate analysis, Edwards finally decided to discard the product in April of 2001 as a total loss.

Over one year after receiving the Microbac results, and more than two years after notification of the loss, on October 11, 2001, Cincinnati Insurance sent the plaintiff a letter advising Edwards that after a review of the Microbac analyses, the on-sight evaluation, and the fact that the "USDA ha[d] not determined that the product [wa]s unsafe for human consumption," there was insufficient evidence to determine that the product was damaged from exposure to ammonia. Accordingly, Cincinnati Insurance denied the claim on the basis that Edwards & Sons had not shown any damage.

Edwards filed this action on January 22, 2002, in the Circuit Court of Surry County, Virginia. The complaint asserted three claims. First, Edwards sought a declaratory judgment that the defendant has an obligation under the policy to pay the claim because the ammonia

exposure had caused damage to Edwards & Sons' product. Second, Edwards & Sons alleged a breach of contract claim against Cincinnati Insurance. Lastly, Edwards asserted that Cincinnati Insurance was acting in bad faith in denying the coverage. Cincinnati Insurance removed the case to federal district court on February 19, 2002. On that same day, Cincinnati Insurance filed in state court its answer and grounds of defense to Edwards & Sons' original complaint.

Once the case was removed, Edwards filed a motion for partial summary judgment, asserting that there was no genuine issue of material fact regarding the claim for declaratory judgment and breach of contract claim (counts I and II). It reserved the bad faith claim (count III) for trial. In response, Cincinnati Insurance filed a motion for summary judgment as to all claims, contending in its accompanying memorandum that there was no damage to the ham products and thus it was not obligated to pay under the policy; that Edwards & Sons could not maintain the breach of contract claim because, *inter alia*, it was filed beyond the two-year limitations period required under the policy;[3] and that it did not act in bad faith in denying the claim.

On July 19, 2002, the district court granted summary judgment in favor of Edwards & Sons on its claims for a declaratory judgment and for breach of contract, but granted summary judgment for Cincinnati Insurance as to the claim of bad faith. On August 1, 2002, Edwards & Sons filed a motion to amend its judgment to include an award of prejudgment interest which was granted by the district court in the amount of $11,191.78.

Cincinnati Insurance appeals the money judgments against it. There is no issue on appeal of bad faith in the denial of coverage by Cincinnati. There is also no issue on appeal as to the amount of damage if any should be awarded. Cincinnati Insurance takes the position that no damages at all are authorized.

---

[3]Under paragraph D of the Commercial Property Conditions, the policy states, "No one may bring a legal action against us under this Coverage Part unless: 1. There has been full compliance with all of the terms of this Coverage Part; and 2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred."

We review the district court's grant of summary judgment *de novo*. See *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 766 (4th Cir. 2003). Summary judgment is warranted when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party has the burden of showing that a genuine dispute exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

## II.

The principal contention of Cincinnati Insurance on appeal is that the district court should have applied a provision of the insurance policy contained as a Commercial Property Condition, numbered D, which is that:

> No one may bring a legal action against us under this Coverage Part unless: . . .

> 2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

It is agreed that the direct physical loss or damage occurred on September 30, 1999 and that this case was filed in the Circuit Court of Surry County, Virginia, on January 22, 2002. So more than two years had elapsed between the date of the damage and the filing of the suit.

The district court held that the time "limitation in the contract becomes the functional equivalency of a code section, and therefore is entitled to the protection that it gets under the Virginia statute." The district court applied "the statute of limitations that applies under Virginia law [and] is five years. See Virginia Code Section 8.01-246 and 243." Virginia Code § 8.01-235 provides in part that "[t]he objection that an action is not commenced within the limitation period prescribed by law can only be raised as an affirmative defense specifically set forth in a responsive pleading."

Although Cincinnati Insurance had filed its grounds of defense in the Circuit Court of Surry County, obviously just prior to removal of

the case, the grounds of defense did not contain any plea or ground of defense that the action had not been commenced, following the terms of the policy, within two years after the date on which the direct physical loss or damage occurred. The district court correctly held that the contractual limitation was an affirmative defense and because it had not been raised in the grounds of defense filed by Cincinnati Insurance, it had been waived by the failure to raise it as an affirmative defense in its responsive pleading.

The district court also held that Cincinnati Insurance had waived the two-year limitation provision in the contract "by its conduct in responding to Edwards' claim."

We agree with the result obtained by the district court, but for a somewhat different reason. See *SEC v. Chenery*, 318 U.S. 80, 88 (1943).

The district court's equating the contractual limitation to a statute of limitations was not authorized under Virginia law. In two cases the Virginia court has held that statutory and contractual limitations are different. See *Massie v. Blue Cross and Blue Shield*, 500 S.E.2d 509 (Va. 1998), and *Board of Supervisors of Fairfax County v. Sampson*, 369 S.E.2d 178 (Va. 1988). The Supreme Court has held in *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945), that a federal court, adjudicating a state-created right solely because the diversity of citizenship of the parties, is obliged to apply the statute of limitations which would be applied by a state court, which the district court related in this case is five years. But applying the Virginia statute of limitations under the rule of *Guaranty Trust Co.* would have no application here because in Virginia, as *Sampson* and *Massie* have held, contractual and statutory limitations are not the same under Virginia law.

The district court's alternate reasons for its decision are next examined. The district court decided that the two-year contractual limitation had been waived by "failing to raise it as an affirmative defense in its responsive pleading and by its conduct in responding to Edwards' claim." Federal Rules of Civil Procedure 8(c) provides in pertinent part that:

> In pleading to a preceding pleading, a party shall set forth affirmatively [among other things] . . . any other matter constituting an avoidance or affirmative defense.

And the Federal Rules of Civil Procedure govern. *Granny Goose Foods v. Teamsters*, 415 U.S. 423, 437 (1974). This is agreed to by Cincinnati Insurance. Br. p.38-39.

We are of opinion that a defense urged by an insurance company of such a breach of a provision of the policy by an insured is an affirmative defense under Rule 8(c). Wright and Miller, *Federal Practice and Procedure* § 1271 (5th Ed. 1994) (noting decisions in United States Courts of Appeal for the Fifth, Eighth and Tenth Circuits); Appleman, *Insurance Law and Practice* (Berdal ed.) §§ 11976 and 12014 (1980) (noting state decisions in Massachusetts, Arkansas, Maine, Texas and Missouri). In *Caterpillar Overseas S.A. v. Marine Transport, Inc.*, 900 F.2d 714 (4th Cir. 1990), a case under the Carriage of Goods By Sea Act, we held that a contractual limitation of liability required the pleading of such a defense under Rule 8(c) and that when all the facts were apparent to the parties, as here, "Such a record would support a waiver of any possible failure to plead," 800 F.2d at 825 n.7, but waiver was not decided when the district court treated any such requirement as waived. 800 F.2d at 825. In *Brinkley v. Harbour Recreation Club*, 180 F.3d 598 (4th Cir. 1999), a Title VII and Equal Pay Act case, we held that a statutory defense of a "factor other than sex defense" under the Equal Pay Act is an affirmative defense which must be pleaded under Rule 8(c) which may result in waiver. Such waiver, however, should not be effective unless the failure to plead resulted in unfair surprise or prejudice. *Brinkley*, 180 F.3d at 612-13.

In the case at hand, we are of opinion that the affirmative defense of a two-year limitation on bringing suit was an affirmative defense which should have been asserted under Rule 8(c) and that the decision of the district court, that it had been waived, was not error. We note that the district court not only correctly characterized the two-year limitation as an affirmative defense but also based its decision on Cincinnati's "conduct in responding to Edwards' claim." That conduct included the following: Cincinnati Insurance was notified of the loss only a few days after the leaking ammonia was discovered. For some

two years it negotiated with Edwards with respect to the amount of the loss, engaged in discovery, attended depositions of witnesses, and examined the reports of proposed witnesses with respect to that loss. Cincinnati Insurance never denied liability on the claim until October 11, 2001, some 11 days after the two-year limitation period of the policy had expired. Although the two-year defense was available to Cincinnati Insurance at the time, the letter denying liability to Edwards relied on the contention of the insurance company that there was no damage, it never mentioned the two-year limitation. In a nutshell, the letter states, "There is still insufficient evidence to determine that this product was damaged from exposure to ammonia." Although the two-year period had expired when Cincinnati Insurance filed its grounds of defense on February 19, 2002, the grounds of defense did not mention the two-year limitation period as a defense. Although the two-year period had expired on September 30, 2001, on April 11, 2002 the case was even set for trial on July 26, 2002, and the two-year period had not then been mentioned. The two-year period was never mentioned until Cincinnati filed its motion for summary judgment and response to Edwards' motion for summary judgment on June 28, 2002, which was the first time the two-year defense was mentioned by the insurance company.

Under such circumstances, we are of opinion and hold that the decision of the district court, that the two-year defense had been waived, was not erroneous. Under the facts of this case, if that defense were not waived, Cincinnati Insurance, by its inaction and persistence that there had been no damage, would simply escape liability. Whether the actions of Cincinnati Insurance were by inadvertence or design, the result does not differ. Edwards was taken by unfair surprise and prejudiced by the delayed assertion of the two-year limitation as a defense.[4]

---

[4]The district court held that Cincinnati waived the two-year limitation of action in the insurance policy. It stated "Cincinnati has waived the two-year limitation provision, both by failing to raise it as an affirmative defense in its responsive pleading and by its conduct in responding to Edwards' claim." J.A., Vol. I, p. 150.

The grounds of defense filed by Cincinnati in the state court just prior to removal did not rely on the two-year limitation. Under the facts of this

III.

The last argument we consider is the contention of Cincinnati Insurance that there was no evidence that the ammonia rendered the meat products damaged. In the most general terms, it argues that the ham products were not adulterated because the evidence would show the meat was not injurious to health.

The policy provides in the building and personal property coverage form that:

> We will pay for direct physical loss of or damage to Covered Property in the premises described.

The policy does not define damage, and the district court gave the policy language its plain and ordinary meaning of "impairment of the usefulness or value of person or property; or harm." It rejected an

---

case and under Virginia law, that would have been a waiver of the notice provision of the policy. *Lumbermen's Mutual Casualty Co. v. Hodge*, 135 S.E.2d 187 (Va. 1964). But under *Erie Railroad* and Fed. R. Civ. P. 81(c), the federal rules apply to "actions removed to the United States District Courts from the state courts and govern procedure after removal." Thus, while the filing of the grounds of defense in the state court may be governed by state law, the actions of Cincinnati in not bringing the policy defense to the attention of the court or the plaintiff until after the case was set for trial is governed by federal law. In that respect, Rule 8(c) requires that such defense "shall be set forth affirmatively," which was never done until Cincinnati's motion for summary judgment was filed and trial was imminent. We do *not* hold that Rules 8(c) and 81(c) require the inclusion of the policy defense in the grounds of defense filed in the state court, but we do hold that the failure of Cincinnati to comply with the substantive provisions of Rule 8(c) is appropriately considered in deciding the effect of the failure to include the policy defense in either the grounds of defense, or in any of the various papers filed with the district court prior to the motion for summary judgment, or in any of the communications made to the plaintiff. Rule 8(c) prevents just such inaction from reaping the benefit of notice timely given under the rules of court.

argument of Cincinnati Insurance that the ham had to be classified as adulterated under USDA regulations relating to meat products.

It relied upon the undisputed facts that the meat was exposed "to very high levels of anhydrous ammonia gas, which is described as both poisonous and toxic"; that the ham was not hermetically packaged; that the ammonia had permeated into the meat; that the exposure caused an odor of ammonia about the meat; and that a discoloration reduced the quality of the meat. The insurance adjuster for Cincinnati Insurance testified in his deposition that some three weeks after the exposure there was still an odor of ammonia in the rooms where the ham involved was stored. Even if most of the laboratory tests of the meat, many of which showed ammonia content, did not show a content high enough to be actually dangerous to human health, one of the samples showed an ammonia content of 938 parts per million, while the danger point was 870. The district court found that the exposure to ammonia caused an odor and discoloration that reduced the quality of the product whether or not it may not have been directly injurious to health or adulterated under the regulations.

We are of opinion the district court was correct in its construction of the policy and in its view of the evidence. The evidence the district court relied on, and we have related, is not subject to contradiction, and even if the argument of Cincinnati Insurance is that Edwards destroyed too much of the ham rather than examining it piece by piece to see which was discolored and which smelled of ammonia, we do not believe, and are of opinion, that no duty of minimizing damages would require Edwards to so segregate the thousands of pieces of ham involved when there was a very real chance of risk to human health in selling the product for human consumption.

In this respect, the witness Krut was prepared to testify that the disposition of all of the ham exposed to ammonia was the way the Hazardous Analysis Critical Control point system of the USDA is supposed to work. If the ham, having been exposed to anhydrous ammonia, had been introduced into commerce by Edwards, in his opinion the USDA would have tagged the product and recommended that Edwards recall it. Krut is the Executive Director of the American Association of Meat Processors and has worked with the USDA's Food, Safety and Inspection Service and in various other aspects of the meat industry.

The judgment of the district court is accordingly

*AFFIRMED*.

MICHAEL, Circuit Judge, concurring in part and dissenting in part:

The Cincinnati Insurance Company issued a commercial property policy to S. Wallace Edwards & Sons, Inc., a wholesaler of ham products. The insurance company agreed to "pay for direct physical loss or damage to Covered Property." Edwards seeks payment of $155,000 for discarded ham that it claims was damaged by exposure to ammonia gas in a cold storage facility when a refrigerant line was cracked by a forklift. I concur in part II of the majority's opinion, which holds that the insurance company waived its defense under the policy provision that requires the insured to bring an action for coverage within two years of the damage. I respectfully dissent, however, from part III of the majority's opinion because I believe there is a genuine issue of material fact about whether the ham was damaged by the ammonia gas. This factual dispute precludes the award of summary judgment to Edwards, the insured. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(e).

The majority points to evidence proffered by Edwards that indicates the ham was damaged by ammonia gas. The problem is that the insurance company proffers evidence, which I will summarize, that goes the other way. An employee of Richmond Cold Storage, where the ham was stored, conducted litmus tests on the ham on two occasions, just after the accident and later during repackaging; neither set of tests showed any ammonia contamination to the ham. J.A. 395, 398-403, 418-22. Edwards engaged Microbac Laboratories, Inc., an independent laboratory, to evaluate the ham. In Microbac's first analysis of the ham, each of three samples had an ammonia content of less than 0.10 percent, well within the range the International Association of Refrigerated Warehouses considers acceptable. J.A. 252, 255, 276. David Danis, Microbac's laboratory director who supervised the testing of the three samples, said that the ammonia levels in the samples "were all at insignificant levels when compared to the control ham hock." J.A. 287. In Microbac's second analysis of seventeen samples, sixteen had ammonia levels within the range that typically occurs in nature. J.A. 247-49, 381-83. One sample had a higher than normal

ammonia content, but an expert explained that the ham's age could have caused the heightened ammonia level. J.A. 382-83. Barbara Starks, a Microbac employee, performed smell and visual tests on the ham samples. Starks did not detect the smell of ammonia about the ham. J.A. 281. Starks did note that the ham was discolored in places, that is, it had brown areas. *Id.* Starks acknowledged that she did not know how ammonia exposure affected the appearance of ham, but she said that the "brown areas were similar to the appearance of product that had been frozen for some time." *Id.*

Microbac, the laboratory chosen by Edwards to test the ham, consistently concluded that the ham was not tainted by the ammonia exposure. Microbac's initial report to Edwards stated that "testing verified that no ammonia residue was present" and that "the meat evaluated falls within acceptable ammonia guidelines for food products." J.A. 252. A second version of the report, which Microbac claims it produced in response to pressure from an Edwards employee, J.A. 255, stated that Microbac could not determine the cause of the brown areas, but it still concluded that the ham was "within acceptable ammonia guidelines for food products." J.A. 253. Both reports stated that Microbac's analyst did not detect an ammonia odor about the ham. J.A. 252-53.

The evidence proffered in the summary judgment proceedings makes clear that a court cannot decide on summary judgment which side is right in this case. There is a genuine factual dispute about whether the ham was damaged by the ammonia leak. I would therefore vacate the award of summary judgment to Edwards and remand the case for trial.