**TAISHO MARINE AND FIRE INSURANCE COMPANY, LIMITED as subrogee of Hamai Machine Tools of America, Inc., Plaintiff,**

v.

**MAERSK LINE, INC., Bridge Terminal Transport, Inc. and the vessel M/V ARNOLD MAERSK, its engine, tackle, equipment and furnishings, Defendants.**

No. 91 C 4375.

United States District Court,
N.D. Illinois, E.D.

June 8, 1992.

Dennis Minichello, Keck, Mahin & Cate, Chicago, Ill., for plaintiff.

Edward J. Ozog, Michael L. Foron, Clausen, Miller, Gorman, Caffrey & Witous, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Taisho Marine and Fire Insurance Company, Limited ("Taisho") as subrogee of Hamai Machine Tools of America, Inc. ("Hamai") sues Maersk Line, Inc. ("Maersk Line"), Bridge Terminal Transport, Inc. ("Bridge Terminal") and the vessel M/V Arnold Maersk (the "Vessel") (defendants will be collectively referred to as "Maersk," treated for convenience as a singular noun), charging damage to some Hamai-manufactured machinery while it was being shipped from Tokyo, Japan to Chicago, Illinois. Taisho sues under the Carriage of Goods by Sea Act ("COGSA," 46 App.U.S.C. §§ 1300–1315[1]), the Harter Act (46 App.U.S.C. §§ 190–196) and the Carmack Amendment to the Interstate Commerce Act (49 U.S.C. § 11707), and it also invokes Ill.Rev.Stat. ch. 95½, ¶¶ 18c–4801 to –4807 and the common law of Illinois.

Both sides now move for partial summary judgment under Fed.R.Civ.P. ("Rule") 56—that is, not for a determination as to Maersk's liability to Taisho or even as to the amount of damage to the machinery, but rather as to whether the operative document and applicable statutes impose a ceiling on the amount of Maersk's potential liability. For the reasons stated in this memorandum opinion and order,

Maersk's motion is granted and Taisho's is denied.

## Facts [2]

In July 1989 Hamai contracted with Maersk Line for the shipment of a vertical machining center (the "Machine") from Tokyo to Chicago. Maersk Line accepted the Machine in good condition and issued a bill of lading, which did not contain a declaration of the Machine's value.

Maersk Line then transported the Machine in the Vessel from Tokyo to Tacoma, Washington and by rail from Tacoma to Chicago. At that point Maersk Line engaged Bridge Terminal to take the Machine by truck from the Chicago railhead to Maersk Line's container yard, also in Chicago. Bridge Terminal did not issue a separate bill of lading. After receiving the Machine in good condition, Bridge Terminal "low bridged" the cargo (brought it into contact with the upper portion of a bridge structure while the truck was passing beneath it) during that final leg of its journey, causing more than $50,000 damage to the Machine.

Hamai's insurer Taisho covered the damage and became subrogated to Hamai's rights against any potentially liable parties. As to Hamai (and therefore as to Taisho), Maersk Line's bill of lading [3] covering the shipment contains two separate clauses that purport to limit the liability of Maersk Line (identified in the bill of lading as the "Carrier") and its agents to $500. At issue in these cross-motions for summary judg-

---

**1.** All further references to COGSA provisions will take the form "Section —," referring to the section numbering in Title 46 App.

**2.** Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citations omitted)). Where as here cross motions are involved, that principle thus demands a dual perspective—one that this Court has described as Janus-like—that sometimes

causes the denial of both motions. That problem cannot arise here, though, because:

1. In lieu of literal compliance with this District Court's General Rule ("GR") 12(m) and 12(n), the parties jointly filed a stipulated statement of facts (cited "GR 12(m) ¶—") as to which there is no dispute.
2. In addition to the absence of disputed facts, the joint GR 12(m) statement also reveals no room for the drawing of inferences in opposite directions that could make the current exercise a dry run. All of the events in this section are set out at GR 12(m) ¶¶ 7–13, 16–17 and Ex. 1.

**3.** All bill of lading provisions will be cited "B/L ¶—."

ment is whether either of those clauses does apply to limit Maersk's potential liability. For that purpose a third clause of the bill of lading, in addition to those two clauses, is relevant. Here are all three of them:

3. SUB–CONTRACTING

(1) The Carrier shall be entitled to subcontract on any terms the whole or any part of the carriage, loading, unloading, storing, warehousing, handling and any and all duties whatsoever undertaken by the Carrier in relation to the Goods.

(2) The Merchant undertakes that no claim or allegation shall be made against any servant, agent, stevedore or sub-contractor of the Carrier which imposes or attempts to impose upon any of them or any vessel owned or chartered by any of them any liability whatsoever in connection with the Goods, and, if any such claim or allegation should nevertheless be made to indemnify the Carrier against all consequences thereof. Without prejudice to the foregoing, every such servant, agent, stevedore and sub-contractor shall have the benefit of all provisions herein benefiting the Carrier as if such provisions were expressly for their benefit, and all limitations of and exonerations from liability provided to the Carrier by law and by the terms hereof shall be available to them, and, in entering into this contract the Carrier, to the extent of those provisions, does so not only on its own behalf, but also as agent and trustee for such servants, agents, stevedores and sub-contractors.

(3) The expression "sub-contractor" in this clause shall include direct and indirect sub-contractors and their respective servants and agents.

5. CARRIER'S RESPONSIBILITY

The Carrier undertakes responsibility from the place of receipt if named herein or from the port of loading to the port of discharge or the place of delivery if named herein as follows:

(1) If it can be proved that the loss or damage occurred while the Goods were in the custody of an inland carrier the liability of the Carrier and the limitation thereof shall be determined in accordance with the inland carrier's contracts of carriage and tariffs, or in the absence of such contracts or tariffs, in accordance with the internal law of the state where the loss or damage occurred.

(2) Where loss or damage has occurred between the time of receipt of the Goods by the Carrier at the port of loading and the time of delivery by the Carrier at the port of discharge, or during any prior or subsequent period of carriage by water, the liability of the Carrier shall be determined as follows:

(a) If the Carriage is to or from the United States of America the "Carriage of Goods by Sea Act 1936" (COGSA) of the United States of America shall apply.[4]

\* \* \* \* \* \*

In no event shall the liability of the Carrier exceed the amount of compensation payable under Clause 6.

6. THE AMOUNT OF COMPENSATION

(1) For shipments to or from ports in the United States of America neither the Carrier nor the Ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of Goods in an amount exceeding $500.00 per package lawful money of the United States of America, or in case of Goods not shipped in packages, per customary freight unit, or the equivalent of that sum of money in other currency, unless the nature and value of such Goods have been declared by the shipper before shipment and inserted on the face of this Bill of Lading and extra freight paid.

---

**4.** [Footnote by this Court] Section 1304(5), part of COGSA, states:

 Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500

per package lawful money of the United States ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

(2) In all other trades where the Hague Rules apply the Carrier's maximum liability shall in no event exceed £100.00 lawful money of the United Kingdom per package or unit [with the identical "unless" clause].

Thus B/L ¶ 6(1) mirrors B/L ¶ 5(2)(a)'s incorporation by reference of COGSA (and more particularly Section 1304(5)) in that the former quite explicitly limits Maersk Line's potential liability to $500, while the latter would have imposed an identical limit if the damage had occurred while the Machine was in transit with Maersk Line itself. Indeed, Taisho has not contested that reading. Instead, the parties' disagreement ultimately centers on whether Bridge Terminal is also protected by the $500 limit under B/L ¶ 6(1) coupled with B/L ¶ 5(1).[5]

### Himalaya Clause

■ Deriving its name from the name of the steamship involved in *Adler v. Dixon*, [1955] 1 Q.B. 158 (C.A.1954), a "Himalaya Clause" is a bill of lading provision that extends the protections and immunities of a carrier to its agents and subcontractors. Maersk Line's Himalaya Clause is found in B/L ¶ 3(2) and purports to extend protection to every "servant, agent, stevedore and sub-contractor" of Maersk Line. Taisho urges that Bridge Terminal is not within that language because the language is too vague and does not explicitly mention inland carriers among the parties covered.

■ There are to be sure some general principles of law disfavoring bill of lading provisions that would limit liability. Thus *Robert C. Herd & Co. v. Krawill Machinery Corp.*, 359 U.S. 297, 305, 79 S.Ct. 766, 771, 3 L.Ed.2d 820 (1959), quoting the concurring opinion in *Boston Metals Co. v. The Winding Gulf*, 349 U.S. 122, 123–24, 75 S.Ct. 649, 650, 99 L.Ed. 933 (1955), says:

[C]ontracts purporting to grant immunity from, or limitation of, liability must be strictly construed and limited to intended beneficiaries, for they "are not to be applied to alter familiar rules visiting liability upon a tortfeasor for the consequences of his negligence, unless the clarity of the language used expresses such to be the understanding of the contracting parties."

And in the process of a court's determining that understanding, any ambiguity in such clauses must be construed in favor of the shipper and against the carrier who claims to be protected (*Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S*, 943 F.2d 220, 223 (2d Cir.1991); *Institute of London Underwriters v. Sea–Land Service, Inc.*, 881 F.2d 761, 767 (9th Cir.1989)).

But while *Herd* expressly refused to extend a bill of lading's general protection to subcontractors in the absence of a Himalaya Clause, several Courts of Appeals that have since discussed Himalaya Clauses (our own has not) have held that *Herd* does *not* require every intended beneficiary to be mentioned specifically in such clauses. They have rather followed the principle explained in *Certain Underwriters at Lloyds' v. Barber Blue Sea Line*, 675 F.2d 266, 270 (11th Cir.1982):

The [*Herd*] "clarity of language" requirement does not mean, however, that COGSA[6] benefits extend only to parties specifically enumerated in the bill of lading. It is sufficient that the terms express a clear intent to extend benefits to a well-defined class of readily identifiable persons. When a bill refers to a class of persons such as "agents" and "independent contractors" it is clear that the contract includes all those persons engaged by the carrier to perform the functions and duties of the carrier within the scope of the carriage contract. No further degree of clarity is necessary.

---

5. It will be recalled that Bridge Terminal did not issue its own bill of lading, so it must look to Maersk Line's bill and the statutes brought into play by that bill for any possible insulation against full liability.

6. [Footnote by this Court] This opinion's next section explains that the liability limitation at issue here does not stem from COGSA. Nonetheless, the same principle applies to other contractual limitations as well (see, e.g., *Assicurazioni Generali v. D'Amico*, 766 F.2d 485, 488 (11th Cir.1985)).

In addition to the reaffirmation of that approach by the same Circuit in *Assicurazioni Generali* and in *Hiram Walker & Sons, Inc. v. Kirk Line*, 877 F.2d 1508, 1516 (11th Cir.1989), it has been adopted elsewhere in *Taisho Marine & Fire Ins. Co. v. The Vessel "Gladiolus"*, 762 F.2d 1364, 1366–67 (9th Cir.1985) and *Barretto Peat, Inc. v. Luis Ayala Colon Sucrs., Inc.*, 896 F.2d 656, 660 (1st Cir.1990).

As the Ninth Circuit's *Taisho* case reflects (762 F.2d at 1367), two factors enter into deciding the *Underwriters at Lloyds'* inquiry as to whether the agent or subcontractor was "engaged by the carrier to perform the functions and duties of the carrier within the scope of the carriage contract":

>     1. "the contractual relation between the party seeking protection and the ocean carrier" and

>     2. "the nature of the services performed compared to the carrier's responsibilities under the carriage contract."

Accord, *Barretto Peat*, 896 F.2d at 660. And in this instance both those factors support the conclusion that Bridge Terminal *was* acting as an agent of Maersk Line when the Machine was damaged.

First, Bridge Terminal was engaged directly by Maersk Line to transport the Machine from the Chicago railhead to the Chicago container yard (GR 12(m) ¶ 11). Second, the document at issue is plainly a through bill of lading[7] intended to cover the shipment of the Machine during its entire journey from Tokyo to the container yard in Chicago. It is entitled "Combined Transport Bill of Lading" and lists "Chicago CY" as the Machine's "place of delivery" (GR 12(m) Ex. 1), and its B/L ¶ 5 explicitly discusses the prospect of damage while the Goods are in the custody of inland carriers after having defined the scope of the Carrier's undertaking in these terms:

> The Carrier undertakes responsibility from the place of receipt if named herein or from the port of loading to the port of discharge or the place of delivery if named herein....

Hence Bridge Terminal's portion of the trip was unquestionably within the scope of Maersk Line's contractual obligation to Hamai, a conclusion additionally supported by the fact that Bridge Terminal did not issue a separate bill of lading to cover its portion of the transport (GR 12(m) ¶ 11). Understandably the parties have agreed in GR 12(m) ¶ 13:

> Maersk was responsible for transportation of the Hamai container from Tokyo, Japan to its container yard in Chicago including the hiring of [Bridge Terminal]....

As an agent engaged by Maersk Line to perform services within the direct scope of that responsibility, Bridge Terminal must perforce be viewed as an intended beneficiary of Maersk Line's Himalaya Clause.

Nor is that plain-language reading at odds with the three cases, all factually distinguishable in a material (that is, outcome-determinative) sense, that Taisho cites in support of its contrary position. One of those cases calls for a degree of explanation, while the other two cases require only brief discussion, to demonstrate that.

*Caterpillar Overseas, S.A. v. Marine Transport Inc.*, 900 F.2d 714 (4th Cir.1990) involved damage that occurred while a tractor was being transported by truck between two ports before its shipment overseas. Although the carrier had hired the trucker, *Caterpillar*, 900 F.2d at 726 held that the latter was not covered by a presumed Himalaya Clause extending protection to independent contractors as well as the carrier itself. But that case was an odd one in which there was no actual bill of lading issued, so that the court looked to

---

7. *Tokio Marine & Fire Ins. Co., v. Hyundai Merchant Marine Co.,* 717 F.Supp. 1307, 1309 (N.D.Ill.1989) (citation omitted) defines that term:

> "A through bill of lading governs the entire transportation of goods and applies to connecting carriers even though they are not parties to the contract." Whether a particular bill so qualifies is a question of fact, and the relevant indicia include whether the final destination is designated thereon, the method by which the connecting carriers are compensated and, more generally, the conduct of those carriers.

the imputed terms of a presumptive document based on the parties' "long record of doing business with each other" (*id.* at 719). And if that bit of fiction were not enough, the transportation by truck that led to the damage had not been anticipated—it resulted because the originally intended shipment via Vessel A from Port X had to be switched to a shipment via Vessel B from Port Y (*id.* at 716–17). Even though none of those things was held sufficient to render the COGSA limitation of liability unavailable to the carrier itself (*id.* at 719–24), the notion that the third-party trucker could invoke the same limitation was perceived by the court as a real strain on the language of the nonexistent document. And perhaps most importantly, the trucker was seeking to obtain the vicarious benefit of a limitation under COGSA's Section 1304(5)—by definition a maritime limitation.[8]

Hence the *Caterpillar* court emphasized that any liability limitation had to relate by definition to the carrier's *maritime* services, though it might also extend to such of those services as might be farmed out to independent contractors. But the court found that the trucker in that case was engaged in activity far removed from the maritime setting, "hauling the tractor a score of miles over a federal highway" (*id.* at 726):

> Marine had both the custody and responsibility for the safety of the tractor while it was transporting the tractor in a truck owned and operated by it over a section of federal-state highway chosen by it and being operated by a driver hired and controlled by it. This is a far different situation than that of the stevedore whose services are rendered in the terminal facilities while engaged in actually loading directly the cargo on the ship. Stevedoring is essentially a maritime trade. Transporting cargo down a group of public highways for a stretch of miles,

on the contrary, is not a normal maritime operation.

By contrast, here Bridge Terminal was performing the tag end of the activity that Maersk Line had contractually undertaken and had then—as permitted—partially subcontracted to Bridge Terminal. And Bridge Terminal is not looking to COGSA as its source of relief—as explained later, it cannot do so—but instead to the provisions of the bill of lading that extend limited liability beyond that statute. It would distort the language of the *actual* bill of lading here to exclude Bridge Terminal from the normal scope of its express references to "subcontractors" and "inland carriers." In sum, *Caterpillar* does not dictate a different conclusion here.

Little needs to be said to demonstrate just how inapposite the second case on which Taisho relies—*Lucky–Goldstar Int'l (America), Inc., v. S.S. California Mercury*, 750 F.Supp. 141 (S.D.N.Y.1990)—is to the situation here. In that case, the railroad involved (Conrail) had been hired by a third party and was not in any contractual relationship with the carrier itself (*id.* at 146). Accordingly Conrail was held not to be among the carrier's "sub-contractors" for purposes of the carrier's Himalaya Clause (*id.*).[9]

Finally, *Royal Ins. Co. v. Westwood Transpacific Service*, No. C 88–832M, 1990 WL 299919, 1990 U.S.Dist. LEXIS 19930 (W.D.Wash. Apr. 24, 1990) also involved a railroad that provided part of the transportation of goods and sought to piggyback onto a Himalaya Clause in the maritime carrier's bill of lading. Because that "bill of lading by inference provides that [the railroad's] terms and conditions of carriage govern the inland transportation of the goods" (*id.*, 1990 WL 299919 at *2, 1990 U.S.Dist. LEXIS 19930 at *4), the railroad ran head-on into overriding statutory provisions that forbade its invocation of any such liability limitation—the Staggers

---

**8.** It will be remembered that the acronym stands for the Carriage of Goods by *Sea* Act.

**9.** Conrail also struck out because, even apart from its absence from the contractual chain (disabling it from relying on the bill of lading's reference to "agent" and "sub-contractor"), the bill also failed to extend the liability limitation to "inland carriers" such as a railroad (*id.* at 145).

Amendment (49 U.S.C. § 10505(e)) and Carmack Amendment (49 U.S.C. §§ 11707(c)(1) and (4) and 10730(c)), which are specially applicable to rail carriers (*id.*, 1990 WL 299919 at \*2–\*3, 1990 U.S.Dist. LEXIS 19930 at \*4 to \*6). Again by contrast, no such superseding statutory bar operates to inhibit Bridge Terminal from calling the provisions discussed in this opinion into play. Just last week our Court of Appeals reconfirmed the inapplicability of the Carmack Amendment to through bills of lading "issued in a foreign country to govern a shipment throughout its transportation from abroad to its final destination in the United States" (*Capitol Converting Equip., Inc. v. LEP Transp., Inc.*, 965 F.2d 391, 394 (7th Cir.1992))—the precise situation here—and the same principle applies to any attempted reliance on the Staggers Amendment.

Nor is this Court persuaded by Taisho's argument that Maersk Line's failure to give specific mention to inland carriers in B/L ¶ 3(2) (the Himalaya Clause) while including them in B/L ¶ 5 reflects an intention that such carriers should not be included in the Himalaya Clause coverage. In fact, the interrelationship between the two paragraphs supports the opposite conclusion. B/L ¶ 3, entitled "Sub–Contracting," discusses subcontracting in general and states in that context that *all* contractual protections and limitations relating to liability (without purporting to define them) shall also extend to subcontractors. Then B/L ¶ 5 in turn delineates those protections and limitations, discussing them in the two contexts of land and water transport. Thus by its explicit discussion of inland carriers, B/L ¶ 5—the obvious referent of B/L ¶ 3(2)'s "all limitations of and exonerations from liability"—makes it more plain, and not less so, that inland carriers were intended to be included among the parties covered by the B/L ¶ 3(2) Himalaya Clause.[10]

**10.** In fact, despite its later argument to the contrary, Taisho appears essentially to have admit-

*$500 Limit*

Taisho also contends that even if the Himalaya Clause covers inland carriers, neither the B/L ¶ 5(2) COGSA $500 limitation nor the B/L ¶ 6(1) general $500 limitation applies to inland carriers. Taisho is right as to B/L ¶ 5(2), which applies only:

> [w]here loss or damage has occurred between the time of receipt of the Goods by the Carrier at the port of loading and the time of delivery by the Carrier at the port of discharge, or during any prior or subsequent period of carriage by water. . . .

By contrast to that provision governing damage sustained during any transportation via water, any damage that has occurred "while the goods were in the custody of an inland carrier" is discussed in B/L ¶ 5(1), which provides that in those circumstances:

> the liability of the Carrier and the limitation thereof shall be determined in accordance with the inland carrier's contracts of carriage and tariffs, or in the absence of such contracts or tariffs, in accordance with the internal law of the state where the loss or damage occurred.

Because Bridge Terminal did not provide a separate bill of lading, its potential liability would therefore be determined in accordance with Illinois law, and it would not be affected by COGSA.

But the analytic journey does not end there. As already stated, B/L ¶ 5 also provides in a later clause that covers *both* its subsections (1) and (2):

> In no event shall the liability of the Carrier exceed the amount of compensation payable under Clause 6.

And the already-quoted B/L ¶ 6 provides in relevant part:

> For shipments to or from ports in the United States of America neither the Carrier nor the Ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of Goods in an amount exceeding $500.00 per package ... unless the na-

ted to that reading earlier at its Mem. 5.

ture and value of such Goods have been declared by the shipper before shipment....

Thus B/L ¶ 6 necessarily limits B/L ¶ 5(1), so that in this instance the inland carrier's liability is governed by Illinois law *except* that the liability may not exceed $500.[11]

Taisho argues that B/L ¶ 6 does not cover inland carriers because its limitation to "shipments to or from ports in the United States of America" makes it applicable only to damage that occurs during maritime transport. But that contention wars with the plain meaning of the contractual language.

First, as Maersk points out, the B/L ¶ 6(1) reference to "shipments to or from ports in the United States" must be understood in light of the parallel B/L ¶ 6(2) reference to "[i]n all other trades where the Hague Rules apply." Those two clauses draw a distinction not between land and water shipment, but between shipment to and from the United States and shipment among other countries.

In addition, B/L ¶ 6(1) precisely replicates the language of Section 1304(5), which sets out the COGSA $500 liability limitation. That being so, if B/L ¶ 6(1) were to be read as if intended to apply only to damage that occurred *on water* in shipments to or from United States ports, it would be wholly redundant of B/L ¶ 5(2)(a), which by its own terms makes COGSA expressly applicable to damage that occurs *on water* during shipment to or from the United States. In other words, the fact of B/L ¶ 6(1)'s inclusion as a separate section, when read together with B/L ¶ 5's equally express incorporation of B/L ¶ 6 through the B/L ¶ 5 "[i]n no event" clause, teaches (1) that B/L ¶ 6 must necessarily have some meaning other than a mere parroting of B/L ¶ 5(2)(a) and (2) that such additional meaning of B/L ¶ 6 is that it relates to both the land and water alternatives of B/L ¶ 5.

Because the B/L ¶ 6 limitation thus squarely relates back to both B/L ¶ 5(1) and B/L ¶ 5(2), it covers Bridge Terminal's potential liability.[12]

### Conclusion

There is no genuine issue of material fact, and Maersk is entitled to a judgment as to its limited liability as a matter of law. Maersk Line is indisputably covered by the $500 liability limitation in its bill of lading. Bridge Terminal is also covered. It is an intended beneficiary of the bill of lading's Himalaya Clause, and the B/L ¶ 6(1) $500 limitation applies to Bridge Terminal's overland portion of the trip. This action is set for a next status date at 9 a.m. on June 18, 1992 to discuss the procedures for arriving at a final judgment.

---

11. Neither side has addressed the impact of Illinois law on Bridge Terminal's potential liability in these partial summary judgment motions. But Ill.Rev.Stat. ch. 26, ¶ 7–309(2) certainly appears to allow such a liability limitation as B/L ¶ 6 specifies.

12. As the just-completed analysis reflects, parsing the bill of lading's provisions is a bit like applying the renvoi doctrine in the conflict of laws. But simply because the reading of a complex document demands a meticulous attention to its terms, that does not somehow render the document "ambiguous" so as to trigger any contra proferentem principles.